Napton, judge,
delivered the opinion of the court.
This was a bill to set aside a conveyance alleged to have been made fraudulently. The facts upon which it was based, were these :
By the will of Jacob Myers, executed in 1884, his slaves, William, Isaac, Jack, and ten others were liberated, and made the devisees of all his lands, except his town lots in Tully, and forty acres in the northeast quarter of S. 26, T. 62, R. 6. These last were devised to his nephew, Robert M. Easton, and the said Easton and William Duncan, (who was son-in-law of Easton) were made trustees for the negroes. The will provided, that in case Jack, one of the liberated slaves, should wish to sell the lands and remove to other lands, the trustees should sell, and with the proceeds purchase other lands for the negroes, where Jack might prefer to live. The real estate thus bequeathed, consisted of about 464 acres of land, lying in the bottom of the river Mississippi, adjoining the town of Tully. On the 3d of August, 1836, Jack signed a written paper, which stated that he (Jack) had made arrangements with Thomas Gray for the sale of the estate devised by Myers to his negroes, and desired the trustees to convey to said Gray. On the 3d of September, 1836, Easton and Duncan conveyed to Gray for the consideration $1,900. Within a week after this conveyance, it was agreed between Gray and Duncan, that the former should convey to the latter, upon the consideration of $2,600 ; but afterwards, and on the 4th of October, 1836, at the request of Duncan, the conveyance was made to *108 Easton, who thereupon paid the seven hundred dollars (the advance in the sale from Gray) to Gray. Easton took possession, made improvements upon the land, and continued in possession up to the filing of the bill, excepting about 28 acres, which he sold to White, one of the defendants.
In October, 1840, this bill was filed. Six of the negroes, beneficiaries under the will of Myers, are the complainants, making the trustees, Duncan and Easton,, and White, the purchaser of the 28 acres, and the seven runaway negroes, including Jack, defendants. The bill charges that the conveyances from the trustees to Gray, and from Gray to Easton, were fraudulent, and the result of a preconcerted arrangement; that the land was sold for less than half its value, and that Jack’s signature to the written paper, requesting the trustees to sell, was procured by imposition upon his ignorance or imbecility.
The answer of Jack details the particulars of the transaction so far as he was concerned, and intimates that he was under duress, or misled and deceived, in signing the paper addressed to the trustees. He insists on the fraud, and makes his answer a cross bill. The answer of the other negroes, defendants, admit the charges of the bill, and pray relief.
Easton’s answer denies all fraud, .and relies chiefly upon the written order of Jack, who, he seems to think, was authorized by the will to control him as trustee. Duncan’s answer is substantially the same with Easton’s. White answered and insisted that he was a bona fide purchaser, for valuable consideration, without notice.
At the June term, 1844, of the circuit court of Lewis county, the death of Easton was suggested, and a bill of revivor filed against his heirs. The heirs filed their answer, adopting that of their ancestor, Easton. Replications were filed.
At the hearing, the material evidence was in substance this : Mun-day, a witness for the complainants, was acquainted with all the parties, and proved the signature of Jack to the paper heretofore alluded to, upon which the parties relied for authority to sell. He had a conversation with Easton shortly after Easton had purchased, which he thus details : “ Easton, I am afraid you have got into difficulty about that land, and you and your children will be lawing about it.” Easton thought not. “ You ought to help the old woman, Sally, who is sick and destitute, &c..” Easton replied that Myers did wrong in giving the property to the negroes, and ££ damn them, I intend to cheat them out of every thing they have.” This witness also heard Gray about *109 the time of his purchase, say that he was not going to settle on the land, that he had bought on speculation, and had nearly completed an arrangement, by which he would make six or seven hundred dollars. Gray did not explain with whom this arrangement was made, but from the laugh of Gray at the time of the remark, the witness understood him to mean Duncan.
Several witnesses testified as to the value of the land in 1836. They varied in their estimates from eight to twenty dollars per acre. It appeared that land of like quality and in the same vicinity had brought as high as twenty-five dollars per acre. One witness had offered Jack $2,300 in cash for the land, but Jack, upon consultation with Easton, had declined selling. Easton’s improvements consisted of a barn, smoke house, fencing, horse mill, and distillery, which cost him about $2,130, but were worth at the trial only $930. Easton added sixty or seventy acres to the enclosed land, and cultivated about one hundred and thirty acres. Seventy acres of which had been enclosed and in cultivation before he took possession. The average rent for this land was $1 00 or $1 25 per acre.
At the March term, 1847, of the Marian circuit court, to which court the cause had been previously removed, a final decree was rendered. All questions as to proper parties, their appearance and mode of defence were raised, and by consent, a decree was entered on the merits. The court pronounced the sales of Duncan and Easton fraudulent and void, and declared the land still subject to the trust, excepting the twenty-eight acres which had been conveyed to White. The bill was dismissed as to White, and his title declared valid. The court further decreed that the complainants recover $398 66, from the estate of Easton, that being the purchase money with interest of the land sold to White. The further sum of $1,398 was also given for the rents and profits. The court directed new trustees to carry into execution the will of Myers, in relation to the trust lands.
The general principles by which the conduct of trustees ought to be regulated, are highly equitable, and obviously based upon sound sense, ordinary prudence and good faith. The general rule is that a party cannot purchase on his own account that which his duty or trust requires him to sell on account of another. He cannot be both buyer and seller. Nor can he do indirectly what the law prohibits him from doing directly. A purchase per interpositam personam, by a trustee or agent of the particular property of which he has the sale, carries fraud on its face.
*110 It is unnecessary to examine the subject further here ; the application of general principles alone, will be sufficient to settle the merits of this controversy. The admitted facts of this case, aside from the testimony of any witness, are such as to carry conviction of some gross unfairness, unless satisfactorily accounted for by the trustees. The sale of this valuable tract of land, apparently without any notice, and certainly without any effort to invite competition, upon the bare request of the cestui’s que trust, against the consequences of whose ignorance and improvidence these trustees were expressly appointed the protectors ; the gross inadequacy of the price being clearly less than one half and probably less than one-third of the amount which a sale at auction upon the usual credit would have commanded. The absence of all the customary precautions to secure the purchase money, no notes or money being taken,nor any security required from the vendee :—the subsequent transfer from this vendee to one of the trustees, within a week after the sale, and at an advance of seven hundred dollars, and the second transfer immediately thereafter to the principal acting trustee, are circumstances carrying on their face such palpable marks of fraud and bad faith, that nothing short of the most clear and satisfactory explanations could account for. But the trustees make no attempt at explanation. ' Their answers contain general denials of fraud, and their sole reliance for a justification of their conduct, is in the paper writing signed by Jack. They would have us believe that they were mere instruments of Jack, subject to his absolute control, and bound by the will of Myers to obey his" dictates, however unreasonable. If the trustees really entertained such am opinion, it was a remarkable instance of fatuity. The testator seems to have been aware of the helpless condition of that class of individuals to whom he was extending his bounty; he knew that their ignorance and proverbial improvidence, together with their degraded condition in society, subjected them to imposition from such of their superiors in condition and intelligence as had sufficient knavery to take advantage of their situation. He therefore interposed agents, or trustees, to protect them against their own imbecility, as well as against the knavery of others. It is true, that he left to these freed men, or to one of the most intelligent of their number, the right of selecting their place of residence.—of continuing to occupy the lands bequeathed to them, or of selling and investing the proceeds in other lands. But furtherthan this, the trustees were not restricted. The time, mode and terms of sale were left to their discretion; nothing was said in the will in relation to these matters, but they were left to *111 be governed by those principles of common honesty which would teach them that they were to exercise ordinary prudence, and take such steps as, without accident, would secure a fair price for the land. The idea that the mere directions of Jack were sufficient to compel them to take an inadequate price, or to sell to an irresponsible buyer, or to sell for cash when a credit sale would be most advantageous, or to sell without notice, privately, to any person whom Jack might designate, receives no countenance from any provision of the will. Such an interpretation would not be likely to suggest itself to any mind imbued with ordinary sagacity, unless where the “ wish was father to the thought.”
Without reverting to the details of the bill of exceptions, it will be seen from the general sketch of the evidence which we have given in the statement, that its tendency is rather to confirm the suspicions arising from the intrinsic character of the transaction, than to exculpate the trustees. It is therefore unnecessary that we should make any particular comments on the testimony. Nor do we deem it necessary to express any opinion upon the alleged contradiction in the answers of' the trustees, or upon the weight to which Jack’s answer is entitled. A minute investigation of these points would only lead to a confirmation of the opinion already entertained of the merits of the decree.
There are some particulars, however, in which we think the decree erroneous. One of these is probably an inadvertence in drawing up-the decree. The forty acres of land devised to Easton, is embraced in the descriptive list given in the decree of the lands devised to the negroes. Although this mistake might not prove fatal to the title of' Easton’s heirs, it being the obvious intent of the decree only to pass the title of the lands devised to the negroes, it is better that the decree be corrected in this respect.
The decree for $1,898 for rents and profits against Easton’s estate, we also think erroneous. The evidence shows that Easton added about seventy acres to the farm. Whether this was timbered or prairie land,, is not stated. If the former, the expense of clearing and fencing it must greatly exceed the amount of the annual rents for ten years; if' prairie land, the expense of breaking and fencing ought to set off its estimated rent. The other improvements are estimated by a witness at $1,800 or $1,900. Their present value is supposed by the same witness to be something less than a thousand dollars. Now the annual rent of the land may be set down at an average of $1 25 per acre, which would make the total rent of the seventy acres (in cultivation when Easton bought) about $875. Equity does not require that any *112 penalty should be visited upon Easton’s heirs for the improper conduct of their ancestor, but that a fair and equitable pecuniary compensation should be decreed to the complainants for actual losses. This is effected, in our opinion, by the decree for the land and the purchase money and interest of the twenty-eight acres sold to White. The improvements should be allowed a set-off against the rents and profits.
As it will be necessary to appoint trustees to carry into execution the will, in respect to the trust property, we shall remand the case, in order that the decree may he amended in the particulars suggested.
The other judges concurring, the decree of the circuit court is reversed, and the cause remanded. a